Statement of the Case.
MONBOE, C. J.
Defendant (a colored woman) was married in Alexandria on January 3, 1891, to William Johnson, and 2% years later, they came to New Orleans, where they established a domicile, which they maintained until the death of the wife, which took place, probably, in January, *1915. Johnson’s trade, or occupation, was that of fireman upon ocean-going steamships, and his absences from home were of four or five months’ duration, while the intervals between them did not usually extend beyond that many days. His wife engaged in the business of renting rooms, and for the purposes of that business retained her maiden name (Mary E. James). She also bought real estate in that name, imr posed mortgages upon it to secure money borrowed in that name, and on December 3,1914, made a will which she signed “Miss Mary E. James,” and, in which she declares that she had never been married, that she wished her mother, Ada Texhada, to “receive what is due her by law”; that she bequeaths certain furniture and $100 to Sarah Johnson; that she owes “Mr. William W. Wren” $5,000, which she desires should be paid to him; that she gives the residue of her estate to her grandmother, Eliza Hines; appoints William W. Wren her executor, and Mr. Anthony J. Iiossi, attorney of her estate, to have charge of all legal matters at her death. The transcript before us was prepared merely for the purposes of the particular issues brought up by the appeal, and leaves a good deal to be assumed. It, however, contains a copy of the will, as filed, and of an inventory, taken by order of court and filed on February 25, 1915, which shows real estate valued at $12,525, movable property valued at $1,614, cash in bank, $1, and a certain draft for $133. It also contains the various acts of purchase by which the real estate so inventoried was acquired, and whereby certain pieces, and perhaps the whole, was mortgaged; the acquisitions, and mortgages alike, having taken place and been imposed during the existence of the marriage with Johnson, but without his participation, and, as to the mortgages, without his knowledge or consent. It is to be assumed that the will was filed and ordered to be executed and the appointment of the executor confirmed, and it is shown by the *947 transcript that in June, 1919, Paul Chretien took two rules on the executor, the civil sheriff, and William Johnson, alleging that in April, 1916, he had caused executory process to issue, in enforcement of mortgages so executed by decedent, as a result of which, and of a similar proceeding by another creditor, certain described real estate, inventoried in the succession, had been seized and sold, in satisfaction of debts due by the decedent and represented by her notes, secured by said mortgages, and that the proceeds had gone into the hands of the sheriff, who had made partial payments on mover’s claims, leaving still due a balance of $3,316, and leaving in the hands of the sheriff two sums of $2,-936.86 and $553, aggregating $3,490, which the sheriff refused to pay over “because one William Johnson claims the whole of said balance,” and further alleging “that all of the properties above described were, respectively, purchased and mortgaged, as aforesaid, by the late Mary E. James as a feme sole, and that the whole amount “represented by the said mortgage notes was paid to her, as such, at the time that the said mortgages were given by her; and that the said notes were acquired in good faith, before maturity.” Mover prayed that said sheriff, executor, and William Johnson be ordered to show cause why said balance should not be paid over to him. The sheriff made a pro forma defense, the executor made none, and Wm. Johnson excepted, on the ground that the rule disclosed no cause of action, and answered, setting up his marriage to decedent, and alleging:
That the property mortgaged belonged to the community of acquets which existed between his wife and himself; that the mortgages, if executed by his wife, were unauthorized by, and without consideration as to him; that the foreclosure proceedings were instituted during his absence, from the state, but that he returned before the property was sold, and that “because of those conditions the purchasers of said property declined to take the titles to same; but, by agreement made between the said purchasers and mover in rule, and the executor * * * and by defendant, the proceeds were deposited with the sheriff * * * subject to the further orders of court, and with full reservations of right of defendant on same, and the portion received by mover was the half belonging to his [defendant’s] deceased wife; that all the balance thereof belongs to defendant, William Johnson, and same should be paid to him.”
The agreement referred to bears date August 6, 1917, is signed by the attorneys representing plaintiff and defendants in rule (except the sheriff, who was without interest) and the purchasers of the property, and is to the following effect, to wit: The purchasers are authorized to pay, and the sheriff to receive, the amounts bid for the property, and thé sheriff is authorized to make deeds thereto; the rights of the parties with respect thereto being referred to the proceeds.
The sheriff is authorized to pay from the proceeds, the taxes due on the property, with interest, and his own costs and commission, and to pay one-half of the balance to Paul Chretien, plaintiff in rule, to be applied on his claim, provided the claim equals or exceeds that amount.
The right of Chretien is reserved to make additional claim as an ordinary creditor against the interest of Mary E. James in the property, real, personal, or mixed, that she may have left, for any balance that may be due him.
That the agreement is made—
“without prejudice to the rights of William Johnson, claiming to be the surviving husband of Mary E. James, to assert such rights as he may have in, or to, or against, the property, but, on the contrary, the said Johnson reserves the right, which is hereby asserted, to assert his rights against the said fund, to the same extent that they could have [been] asserted against the property if it had not been sold, it being understood and agreed, however, that the said property shall pass to the respective purchasers thereof free from any claim by said Johnson in, or against, the same. It is further * * ® agreed that the said fund shall remain in the hands of the sheriff until *949 the * * * termination of the litigation in which the right to the same shall he involved, and * * * shall thereupon be paid to such person, or persons, as the court may decide entitled to the same.”
On the trial of the rule, a man who lived across the street from the decedent, and who was called as a witness by plaintiff in rule, testified that he had known decedent for a number of years, and that she never told him that she was married; that he supposed she was unmarried, and called her “Miss Erancis” without being corrected; but, as no one pretends that her name was Erancis, the testimony only goes to show that it was a matter of indifference to her by what name the witness addressed her, or, perhaps, that she never observed it. Another witness, called by plaintiff in rule, w'as a boy, who testified that decedent was his godmother, and that he lived with her for 7 years; that when he gave his testimony he was 14 years old; at one time, that he had left decedent’s house and gone to live with his mother about two months before decedent died; at another time, “during the time I [he] was staying with her, I was 6 or 7 years old.” He also testified' that Violet Tesada and Cooper Haynes lived at decedent’s when he was there, but that he never saw Johnson.
Violet Texada, decedent’s grown sister, and Cooper Haynes (or “Hynes,” or “Hines”), the husband of her grandmother, testified that they lived at decedent’s house, and corroborated Johnson’s story of the marriage and the maintenance of the marriage relation. The marriage is, however, established by unchallenged documentary evidence. Neither the mother nor the grandmother of decedent, nor Sarah Johnson, her daughter, all mentioned in her will, were called as witnesses, nor was the executor; and, although the attorney named in the will testified that he and certain clients of his were the owners of the notes, sued on in the name of Paul Chretien, and that Chretien had no interest in them, he did not testify that he was ignorant of the fact that decedent was a married woman, and his clients were not called as witnesses. There was judgment in the trial court in favor of plaintiff in rule, and defendant, Johnson, has appealed.
Opinion.
[1, 2] The purchasers of the property, having been warned of the condition of the title, held up the price until by the agreement between the parties they'were able to pay it in safety, which having done, and having received a good title, they have no reason to complain, and are making no complaint. The appellees, who loaned this money upon the security of a mortgage imposed by a married woman, without the knowledge or consent of her husband, upon property which belonged to the community, having been awarded, by the judgment appealed from, as in payment pro tanto of the loans so made by them, not only the one half of the proceeds of the mortgaged property inuring to the succession of their debtor, the deceased wife and partner in community, but also the other half which belongs to the surviving husband, who owes them nothing, now seek to have that judgment affirmed; and they array against the law which denies the wife the power to sell or mortgage the property of the community during the life of the husband the law which declares that no sale or incumbrance of immovable property shall affect third persons unless recorded in the proper office. Whilst, however, the difficulty presented by the apparent conflict thus mentioned may be thought to require a remedy, the doctrine that the one rule is to be taken as an exception to the other is too well settled in our jurisprudence to justify the courts in attempting to supply such remedy. The husband, being head and master of the community, the title to property acquired for it is ordinarily acquired in his name, and yet when the wife dies and the community is thereby dissolved, though the title still stands *951 recorded upon the public records as vested in the husband, and though the death of the wife is not so recorded, a purchaser, guided by the public records, cannot acquire the interest of the deceased wife by a conveyance from the husband, as the apparent holder of the title to the whole. And the same is true where, as in this ease, the title stands in the name of the wife and the husband dies; the jurisprudence being as unvarying in the one case as in the other, and being in both cases founded upon provisions which are equally as explicit as those which declare that, as to third persons, the title to real estate is affected by nothing which is not recorded.
The particular contention of the appellees is that the wife (now deceased) bought the property, not only in her own name, but as a feme sole; that the husband was guilty of laches in allowing matters to go on in that way during a series of years without finding it out, and that, as between him and those who loaned money to his wife, calling herself Miss Mary E. James, he was most at fault, and should sustain the resulting loss. The law, however, reads:
“This * * » community consists * * * of the * * * produce of the reciprocal industry and labor of both husband and wife, and of the estates which they may acquire during marriage, either by donations made jointly to them both, or by purchase, or in any similar way, even although the purchase be only in the name of one of the two and not of both, because in that case, the period of time when the purchase was made is alone attended to, and not the person who made the purchase. * * * ” C. O. art. 2402.
If, then, it is the period of time when the purchase was made, which is “alone to be attended to,” and not' the name of the purchaser, the only question remaining is whether it devolves upon a person who deals with a purchaser of immovable property to find out whether he or she was married or single at the date of the purchase, and we must hold in the affirmative on that question, or reverse a long-established jurisprudence to the effect that one cannot acquire a title to the interest of a deceased wife, to the prejudice of her heirs, by a purchase from the surviving husband, even though the title to the entire property stands in his name.
As to the alleged laches of the appellant, he appears to be an ignorant seafaring man, who probably could not have read a title if one had been shown him, and who, being told in the short intervals between his voyages that his wife had bought property, made no further inquiry upon the subject. On the other hand, the appellees were represented by an intelligent attorney, who seems to have made it somewhat of a business to lend money for himself and his clients, who knew that a married woman could not legally mortgage community property, and yet who, though on the stand as a witness, has altogether failed to state that he loaned the money here in question to the decedent upon any assurance by her, or any belief of his own, that she was an unmarried woman when the property mortgaged to secure the loans was acquired. The fact that decedent declared in her will that she had never been married appears peculiar, not to say, silly, since she left behind her a sister, mother, grandmother, stepgrandfather, and grown daughter, all of whom knew, or understood, that she had been married, and up to the moment of her death continued to be married, not to mention the record of the marriage in Alexandria, and the surviving husband on the high seas, perhaps homeward bound; but the peculiarity of the statement does not appear to us to affect the rights of the appellees, though it may have been so intended.
It is therefore ordered and decreed that the judgment appealed froih be annulled; that the demands of Paul Chretien, plaintiff in rule, be rejected and his rule dismissed, and that there now be judgment in favor of William Johnson, defendant in rule, and against *953 said Chretien, as also against William W. Wren, executor, and Louis Knop, civil sheriff, decreeing him (Johnson) to be the owner of and directing said sheriff to pay over to him the balance now in his hands of proceeds of sales of immovable property of this succession, amounting to $3,490.74.
It is further ordered that said Paul Chretien, plaintiff, pay all costs beginning with the rule first filed by him in this matter. ■