526 So.2d 1086 (1988)
Elizabeth Langley CAMEL
v.
Ellen H. WALLER, Karen Jayne Barber and Vaughn Barber.
No. 87 C 2479.
Supreme Court of Louisiana.
May 23, 1988.
*1087 Larry Book, Baton Rouge, for applicant.
James Clary, Jr., Gary O'Neill, Baton Rouge, for respondents.
CALOGERO, Justice.
This is a suit for partition by licitation brought by a divorced wife against parties whose chain of title derives from her former husband. She claims to be an owner in indivision of two pieces of immovable property. The properties were purchased by her ex-husband during the marriage and during the existence of a community of acquets and gains. They were sold by him after the community was terminated by judgment of separation from bed and board. In both acquisitions and in the subsequent acts of sale of the two properties the husband declared that he was judicially separated from plaintiff. In fact he and plaintiff were not judicially separated at the time the property was acquired, although they were judicially separated by the time the property was sold.
The immediate parties to the suit (the plaintiff-wife and the current record owners of the property) agreed by stipulation on the issue to be decided in this case:
Does the original plaintiff, Elizabeth Langley Camel, have any ownership interest in either unit number 1 or unit number 4 of the French Quarter Court Condominiums andif soin what percentage for each unit?
We granted this writ to decide whether the courts below were correct in dismissing plaintiff's suit for partition by licitation of these two pieces of property.
Elizabeth Langley Camel and Patrick Camel were married in East Baton Rouge Parish on June 16, 1962. The couple voluntarily separated on August 16, 1975. On December 29, 1975, Patrick Camel purchased Condominium Unit Number 4 in French Quarter Court located in the City of Baton Rouge from JDA Investment Properties, Inc. for the sum of $25,000.00. In the act of sale he declared that he had been "married but once and then to Elizabeth Langley Camel, born Langley, from whom he is judicially separated", when in truth the couple were still married at the time. On that same day, Patrick Camel and one Ellen H. Waller purchased Condominium Unit Number 1 of French Quarter Court Condominiums for the sum of $26,000.00. In that act of sale, Patrick Camel similarly declared that he had been "married but once and then to Elizabeth Langley Camel, born Langley, from whom he is judicially separated."
On January 12, 1977, a little over a year after the purchases, Elizabeth Camel filed a petition for separation from bed and board on the grounds of living separate and apart. She asked that a temporary restraining order be granted prohibiting Patrick Camel from alienating, encumbering or disposing of any and all community property. The temporary restraining order was granted on January 25, 1977. A preliminary injunction to the same effect was issued on February 3, 1977. On August 22, 1977, the judgment of separation was granted by default. Neither the temporary restraining order, the preliminary injunction, nor the judgment of separation were ever recorded.
On March 20, 1978, some eight months after the judgment of separation had been granted, Patrick Camel and Ellen Waller sold Unit # 1 to William Walker Squyres for $43,000.00. In the act of sale, Patrick Camel accurately declared that he was then judicially separated from Elizabeth Camel.
On March 23, 1978, just three days after the sale of Unit # 1 to Squyres, Patrick Camel sold Unit # 4 to Ellen Waller for *1088 $33,088.82. In this act of sale, Patrick Camel again accurately declared that he was judicially separated from Elizabeth Camel. Ellen Waller remains as owner of Unit # 4.
On December 15, 1978 Elizabeth Camel was granted a judgment of divorce. That judgment was recorded on that same date in the Parish of East Baton Rouge.
Some eight months after the judgment of divorce was rendered, William Squyres sold Unit # 1 to Karen Jayne Barber and Vaughn Barber on August 23, 1979 for the sum of $56,000.
To date no judicial partition of the community which existed between Patrick and Elizabeth Camel has been effected, nor do the parties contend that there has been a voluntary partition which has settled the couple's rights in these two condominium units.
On December 7, 1983, Elizabeth Camel filed in East Baton Rouge Parish the lawsuit which is the subject of the district court judgment below and this review, a petition for partition by licitation. She alleged that she was the owner of an undivided one fourth interest in Unit # 1, in common with the record owners, Karen and Vaughn Barber. She also alleged that she was an undivided one half owner of Unit # 4, in common with the record owner, Ellen Waller.
Plaintiff filed a second amended and supplemental petition in which she alleged the bad faith of defendant Ellen Waller in that "she knew or should have known his (Patrick Camel's) interest in the property was formerly community property ..." and that plaintiff "owned an undivided interest in the units." These allegations of bad faith were later withdrawn by plaintiff in an additional stipulation of facts.
In the course of this proceeding Ellen Waller moved for summary judgment, as did Karen and Vaughn Barber. Both motions for summary judgment were denied by the trial judge.
The trial judge rendered judgment in response to the stipulated issue, finding that Elizabeth Camel "has no interest whatsoever in either Unit No. 1 or Unit No. 4 of the French Quarter Court Condominiums." Plaintiff's suit was dismissed with prejudice. On appeal the First Circuit Court of Appeal affirmed the trial court's judgment. 515 So.2d 611.
A married person's rights in property purchased by the other spouse during the existence of a community vest in that person by operation of law at the time of the acquisition of the property. Thigpen v. Thigpen, 231 La. 206, 91 So.2d 12 (1956); Phillips v. Phillips, 160 La. 813, 107 So. 584 (1926). Thus, plaintiff, although not a named vendee in her husband's acquisition, acquired an interest in the two condominiums not apparent on the public records at or after the time her husband purchased them.
On the other hand, defendants purchased property on the strength of a public record which was silent regarding plaintiff's interest. The record showed that at the time of the acquisition of the two units Patrick Camel was the vendee and he was judicially separated from Elizabeth Langley Camel. When Patrick Camel and Ellen Waller sold Unit # 1 to William Squyres (who later sold it to defendants Karen and Vaughn Barber) and when Patrick Camel sold Unit # 4 to defendant Ellen Waller, the record reflected the same state of affairs existing then.
Thus, this case pits a plaintiff relying on longstanding legal principles favoring rights in community property against defendants relying on the public records doctrine. The competition between these conflicting legal principles has been noted in various law review articles and cases. Shapiro v. Bryan, 132 So.2d 97 (La.App. 4th Cir.1961); Comment, Registration of Title to Immovables in Louisiana, 32 Tul.L. Rev. 677, 683-85 (1958); Note, SalesCommunity PropertyRecordation of DivorceArticles 2266, 2402, 2406, Louisiana Civil Code of 1870, 24 Tul.L.Rev. 375, 377 (1950); Comment, Recordation Problems in Louisiana Mineral Matters, 23 Tul.L.Rev. 259, 264-65 (1948). See also, Jackson v. D'Aubin, 338 So.2d 575 (La.1976); Speights v. Nance, 142 So.2d 418 (La.App. *1089 2d Cir.1962); Redmann, The Louisiana Law of Recordation: Some Principles and Some Problems, 39 Tul.L.Rev. 491 (1965); The Work of the Louisiana Appellate Courts For the 1962-63 Term: Conventional Obligations, 24 La.L.Rev. 192, 196 (1964); Comment, "Tradition" In the Civil Law, 22 La. L.Rev. 418, 433-34 (1962); Note, SalesScope of the Public Records DoctrineSuccession Judgments, 12 La.L.Rev. 51 (1952).
The outset legal question posed by the parties is whether defendant purchasers may rely, to defeat plaintiff's community property rights and relative to the public records doctrine, upon the marital description given by Patrick Camel in the acts by which he acquired the property in dispute. As noted, he had stated that he was judicially separated.
The answer, of course, is that such purchaser cannot rely on that declaration of marital status so as to validate the purchaser's acquisition in preference to the interest of the ex-wife. Succession of James, 147 La. 944, 86 So. 403 (1920); Redmann, 39 Tul.L.Rev. at 500. See also, Gulf Union Mortgage Corp. v. Michael & Barber Construction Co., 251 So.2d 459 (La. App. 1st Cir.1971) ("The fact that an instrument is recorded does not have the effect of making all recitals contained therein true." Id. at 462).
The present statutes establishing the public records doctrine are Civil Code article 1839 and La.Rev.Stat. §§ 9:2721 and 2756.
Art. 1839, entitled Transfer of immovable property provides:
A transfer of immovable property must be made by authentic act or act under private signature ...
An instrument involving immovable property shall have effect against third persons only from the time it is filed for registry in the parish where the property is located.
La.Civ.Code Ann. art. 1839 (West 1987)[1]
La.R.S. 9:2721 provides:
No sale, contract, counter letter, lien, mortgage, judgment, surface lease, oil, gas or mineral lease or other instrument of writing relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder of the parish where the land or immovable is situated; and neither secret claims or equities nor other matters outside the public records shall be binding on or affect such third parties.
La.Rev.Stat.Ann. § 9:2721 (West 1965).
La.R.S. 9:2756 provides:
All sales, contracts and judgments affecting immovable property, which shall not be so recorded, shall be utterly null and void, except between the parties thereto. The recording may be made at any time, but shall only affect third persons from the time of the recording.
The recording shall have effect from the time when the act is deposited in the proper office, and indorsed by the proper officer.
La.Rev.Stat.Ann. § 9:2756 (West Supp. 1988).[2] These three statutes, operating in tandem comprise the public records doctrine as it applies here. See also, La.Rev. Stat.Ann. §§ 9:2721-2733, 2741-2759 (on Registry) (West 1965 & Supp.1988).
The public records doctrine is "founded upon our public policy and social purpose of assuring stability of land titles...." Blevins v. Manufacturers Record Publishing Co., 235 La. 708, 772, 105 So.2d 392, 414 (1958) (Tate, J. on rehearing). But as Justice Lemmon notes, that doctrine does not "create rights in a positive sense, but rather *1090 has the negative effect of denying the effectiveness of certain rights unless they are recorded." Phillips v. Parker, 483 So.2d 972 (La.1986) (Lemmon, J.) Also, as Judge Redmann has so aptly pointed out, it is an essentially negative doctrine. Third persons are not allowed to rely on what is contained in the public records but can instead "rely ... on the absence from the public record of those interests that are required to be recorded." Redmann, The Louisiana Law of Recordation: Some Principles and Some Problems, 39 Tul.L.Rev. 491 (1965). Thus, a third party is not protected by reliance on a recitation of marital status in the public records, Succession of James, supra 147 La. at 944, 86 So. at 403, but can rely on the absence of a claim from the records. State ex rel. Hebert v. Recorder of Mortgages, 175 La. 94, 143 So. 15 (1932); Westwego Canal & Terminal Co. v. Pizanie, 174 La. 1068, 142 So. 691 (1932). "[T]he primary concern of the public records doctrine is the protection of third persons against unrecorded interests." Phillips, 483 So.2d at 976. "[N]o right of any nature in immovable property can have any effect against third parties unless it is registered in the conveyance records or recorded in the mortgage records for the parish in which the property is situated...." Sarpy, Form in Louisiana Contracts Involving Rights in Property, 14 Tul. L.Rev. 16, 25 (1939).
Thus, the public records doctrine in its operative effect in a case of this sort, does not protect a third party purchaser by permitting him to rely upon a prior purchaser's misstated marital status in the latter's acquisition. But as will be recited in the reasons stated hereinafter, that doctrine does serve to protect these third party purchasers in a case like the one under consideration here.
The landmark decision of McDuffie v. Walker established the principle that a third person can acquire valid title from the owner of record even where the record owner is not the true owner since an act of sale of immovable property not recorded is null as to third parties. McDuffie v. Walker, 125 La. 152, 51 So. 100 (1909). See also, Bolding v. Eason Oil Co., 248 La. 269, 178 So.2d 246 (1965); Blevins v. Manufacturers Record Publishing Co., 235 La. 708, 105 So.2d 392 (1958); State ex rel. Hebert, 175 La. at 94, 143 So. at 15; Westwego, 174 La. at 1068, 142 So. at 691; Comment, Recordation Problems in Louisiana Mineral Matters, 23 Tul.L.Rev. 259, 259-60 (1948); Note, Sales-Recordation-Contract to Sell-Specific Performance-Article 1517, Louisiana Civil Code of 1870, 22 Tul.L.Rev. 208, 209 (1947). Thus third persons can take any rights to immovables that are free from unrecorded claims. Comment, "Traditio" in the Civil Law, 22 La.L.Rev. 418, 433 (1962).
This system of registry, designed to protect the security of title to real estate, stands in stark contrast to La.Civ.Code art. 2452's declaration that "the sale of a thing belonging to another is null". La.Civ.Code Ann. art. 2452 (West 1952).
The right to ownership of property is embedded in our law. La. Const. of 1974, art. 1, § 4; La. Const. of 1921, art. 1, § 2. Yet the public records doctrine has been given effect to the prejudice of the acquiring party where there is an absence of recordation. One type of acquiring party who has drawn special attention in the jurisprudence is the spouse in community. Courts favoring the acquiring spouse who does not appear in a recorded deed have often alluded to the long statutory and jurisprudential legal history that has evolved to ensure the protection of the community property system, e.g., Succession of James, 147 La. 944, 86 So. 403 (1920), a system designed to promote the stabilization and economic protection of the family. T.L. James & Co., Inc. v. Montgomery, 332 So.2d 834, 842 (La.1975); Daggett, Policy Questions on Marital Property Law in Louisiana, 14 La.L.Rev. 528 (1954).
Also of significant note for the purpose of this opinion is the fact that until the 1979 revision of Book III, Title VI of the Louisiana Civil Code (Matrimonial Regimes) accomplished by 1979 La.Acts, No. 709 (effective Jan. 1, 1980), the marital property law of this state characterized the husband as "head and master" of the community *1091 of acquets and gains. Under this scheme, the husband had sole authority to administer community effects and could alienate immovable property belonging to the community without his wife's participation or consent. La.Civ.Code Ann. art. 2404, repealed by 1979 La.Acts, No. 709, § 1 (effective Jan. 1, 1980); Pitre v. Pitre, 247 La. 594, 172 So.2d 693 (1965); Humphreys v. Royal, 215 La. 567, 41 So.2d 220 (1949).
In spite of her husband's false declaration in the act of acquisition that he was judicially separated at the time of the purchase (in effect, claiming that the property was his separate property), the property here in dispute is presumed to be community property since it was acquired during the existence of the community and since the act did not contain the required double declaration that he purchased the property with his separate funds and for his separate estate.[3]Smith v. Smith, 230 La. 509, 89 So.2d 55 (1956); Slaton v. King, 214 La. 89, 36 So.2d 648 (1948); Succession of Bell, 194 La. 274, 193 So. 645 (1940). But even where the presumption of community applies, as here, the husband as head and master of the community was at liberty to sell community property standing in his name alone without his wife's consent. Azar v. Azar, 239 La. 941, 120 So.2d 485 (1960); Provost v. Harrison, 205 La. 21, 16 So.2d 892 (1944); Demarets v. Demarets, 144 La. 173, 80 So. 240 (1918); Op.Att'y Gen. 1942-44, p. 472.
It was inevitable that the tenets concerning the matrimonial regime of community property and the public records doctrine, both deeply embedded in this state's legal history, would collide. And of course they did. In Succession of James, 147 La. at 944, 86 So. at 403, this court rejected the argument that the public records doctrine protects the third party mortgagee from the undisclosed interest of a spouse in community, a husband in that case, where the acquiring, and later mortgaging spouse (a wife) declared in both instruments that she was single.
In the interim between the decision in James and the later decision of this Court in Humphreys v. Royal, the James case was cited as authority only rarely and then never in the context of a contest between community property law and the public records doctrine. Johnson v. Johnson, 213 La. 1092, 36 So.2d 396 (1948); Mathews v. D'Asaro, 14 La.App. 328, 126 So. 246 (1930); Bench and Bar: Trends in Louisiana Law of the Family, 9 La.L.Rev. 89, 100 (1934). However, other decisions reflected the continuing struggle between the two concepts in cases where a claimant's interest in land arose by operation of law on the termination of the community either by dissolution or by the death of one spouse. See, for example, Thompson v. Thompson, 211 La. 468, 30 So.2d 321 (1947); Stone v. Jefferson, 196 La. 1057, 200 So. 461 (1941); Bell v. Canal Bank & Trust Co., 193 La. 142, 190 So. 359 (1939); Chachere v. Superior Oil Co., 192 La. 193, 187 So. 321 (1939); Porterfield v. Parker, 189 La. 720, 180 So. 498 (1938); Long v. Chailan, 187 La. 507, 175 So. 42 (1937), after remand, 196 La. 380, 199 So. 222 (1940); Beard v. Nunn, 172 La. 155, 133 So. 429 (1931); Otis v. Texas Co., 153 La. 384, 96 So. 1 (1922) (reversed on rehearing).
Then came this court's decision in Humphreys v. Royal, 215 La. 567, 41 So. 2d 220 (1949). The relevant facts were different from those in James. There a husband acquired property during a marriage, declaring in the act of purchase that he was a single man. He then sold, following an unrecorded divorce. But the equities were also different. In Humphreys, it was not the divorced wife who was championing the cause of a wife's rights in community property, but a land speculator who had purchased his interest in the property from the wife.
The majority in Humphreys did not denigrate the wife's legally operative acquisition, but rather distinguished the James *1092 decision by stating that a judgment affecting immovable property had not been rendered in James (the James' community terminated upon the death of the vendee-mortgagor, Mrs. James) while a judgment of divorce had been rendered in Humphreys. The Humphreys majority held, without fuller explanation, that an "unrecorded divorce judgment affecting the immovable property in controversy is utterly null and void as to the defendant here, a third party". Id. at 573, 41 So.2d 222.
That opinion drew a dissent which complained that the settled law until then had resolved the conflict "in favor of the community owner rather than in favor of the one relying on the registry", and that the majority had permitted "the husband in this case, by his false and untrue statements made in the deeds that he was a single man, to take away from the wife her vested interest in the property." The dissenter, alluding also to James, opined that "it is the duty of a person who deals with a purchaser of immovable property to find out whether he or she was married or single at the date of such purchase." Id. at 575-77, 41 So.2d at 223 (Hawthorne, J., dissenting).
Humphreys and its legal analysis did not meet with consistent acclaim among the law review writers who discussed the case. See 39 Tul.L.Rev. at 502-04; 32 Tul.L.Rev. at 677; 24 Tul.L.Rev. at 375; Note, Sales Effect of Recordation on Community Rights, 11 La.L.Rev. 389 (1951). But cf., 22 La.L.Rev. at 433-34; 12 La.L.Rev. at 513. But Humphreys was not wrong in its result, as will be seen hereinafter.
The debate on the interplay of community property rights and the public records doctrine continued following the Humphreys pronouncement. Head v. Bradley & Braud, Inc., 368 So.2d 723 (La.1979) (Tate, J., dissenting from denial of writs); Hodgeson v. McDaniel, 233 La. 180, 96 So.2d 481 (1957); Bishop v. Copeland, 222 La. 284, 62 So.2d 486 (1952); Gregory v. Womack, 300 So.2d 213 (La.App. 2d Cir.), writ denied, 302 So.2d 622 (1974) (wife had "ample protection of her rights in the property had she complied with the Louisiana laws relating to registry." Id. at 215.); Speights v. Nance, 142 So.2d 418 (La.App. 2d Cir.1962); Shapiro v. Bryan, 132 So.2d 97 (La.App.1961) (wife under duty to record notice of her suit for separation to prevent husband's sale of community property).
The results in these cases indicate that the law in this area is by no means settled. Furthermore, a recent statutory change in the law may affect the outcome of future similar cases.[4] La.R.S. 35:11. We need not consider in this case whether the 1987 amendments to La.R.S. 35:11 are to be *1093 afforded retroactive application because plaintiff brought her action well before the six month grace period following the effective date of the statute, in fact, some several years before its enactment.
We perceive Humphreys and the case at bar to be distinguishable from Succession of James, but for reasons different from those stated by the majority in Humphreys. Furthermore, in the context here involved (prior to the 1980 Revision of Civil Code provisions on matrimonial regimes, and unaffected by 1987 statutory amendments to La.R.S. 35:11 (See footnote 4 supra )), we apply the public records doctrine here favorably to the third party purchaser and contrary to the plaintiff, former wife in community.
While the purchaser may not rely on the misstated marital status in Patrick Camel's acquisition (that he was judicially separated and thus acquiring for his separate estate), nonetheless, a third party purchaser we hold, can rely upon the absence from the public record of the instrument which would have signaled that Patrick Camel was no longer in singular control of property which he might have acquired. That instrument was the judgment which terminated the community. Until such instrument was recorded the purchaser could have assumed that Mr. Camel was judicially separated, as he had declared upon acquisition, or single, in which event he could later sell the property without the participation of a wife or ex-wife, or that he was not judicially separated or single but rather married and living in community, and thus had not lost his right as head and master of the community to dispose of community property alone.
Unlike Isiah Payne, the husband in Humphreys, Mary James, the acquiring and later mortgaging "femme sole" in Succession of James, had no power to encumber or alienate community property as wife, for under the prevailing law the wife was not head and master of the community.
"This case (Humphreys v. Royal) is not contrary to the Succession of James. Whereas the wife in the James case had no power to defeat her spouse's vested interest in the community property, the husband in the Humphreys case did have such power, and as far as third parties were concerned recordation of the judgment of divorce, like recordation of a prior sale, was necessary to destroy that power. Article 2266 of the Louisiana Civil Code requires recordation for final judgments as it does for contracts affecting immovable property."
12 La.L.Rev. at 513.
In the case under consideration, Elizabeth Camel acquired an undivided interest, albeit unrecorded, in the two properties. Yet so long as the marriage existed, her interest was subject to being defeated simply by her husband's act of conveying the community interest. Elizabeth Camel could have alerted third party purchasers to the newly acquired right of joint control attending her undivided co-ownership interest by recording her judgment of separation, if not her injunctions, in the parish "where the land or immovable is situated" (in this case the parish of matrimonial domicileEast Baton Rouge Parish). She did not do so. Consequently, "the judgment affecting immovables", that is, a judgment changing the husband's right to convey alone, to a right of joint control, is not "binding on" and does not "affect third persons". La.Rev.Stat.Ann. § 9:2721 (West 1965). In this context Elizabeth Camel's "claim", the right to enjoy joint control of property owned in indivision, which is "outside the public records" "shall [not] be binding on or affect third persons", La.R.S. 9:2721, and indeed, it is "utterly null and void, except between the parties...." La.Rev.Stat.Ann. § 9:2756 (West Supp.1988).
Consequently, the absence of the judgment terminating the community, a judgment which created in plaintiff the right to exercise control over formerly community property, permitted third party purchasers to acquire free and clear of her claims the property which her husband as head and master of the community was at liberty to convey alone, absent recorded notice to the contrary.
*1094 We hold, in this context, that plaintiff's interest, which could have been cemented by recordation, is defeated because the public records doctrine prevails.
The law is well settled that a third person can acquire a good title to immovable property from the owner of record, even though he has been appraised of the equities or rights of others in the property that did not appear of record, in accordance with the law of registry.
Bell v. Canal Bank & Trust Co., 193 La. 142, 190 So. 359 (1939) (citing, inter alia, McDuffie v. Walker, 125 La. 152, 51 So. 100 (1909) (other citations omitted)).
One more noteworthy comment in this case is that recordation of the judgment of divorce after transfer of Unit # 1 (Camel and Waller to Squyres) but before the transfer from Squyres to the Barbers does not require a different result regarding plaintiff's claim against the Barbers. Since Squyres was free to rely on the absence of any recorded instrument evidencing Elizabeth Camel's right of control in the property, he acquired the property in preference to plaintiff's interest and was thereafter at liberty to transfer to the Barbers all the rights in the property which he had acquired.

DECREE
For the foregoing reasons, the judgment of the courts below is affirmed.
AFFIRMED.
LEMMON, J., concurs.
DENNIS, J., concurs with reasons.
DIXON, C.J., respectfully dissents with reasons.
DENNIS, Justice, concurring.
I respectfully concur.
It should be noted that although the recordation of the divorce judgment did not affect the transfer from Squyres to the Barbers, if Patrick Camel were to reacquire the property, then the plaintiff could claim her part.
DIXON, Chief Justice (dissenting in part).
I subscribe to this opinion in principle but dissent from that part which ignores the effect of the recordation of the divorce in the Squyres-to-Barber sale. The unrecorded judgment did not deprive Elizabeth Langley Camel of the ownership of the property; it was void "except between the parties thereto" (R.S. 9:2756) and if Patrick Camel should reacquire the property Elizabeth could claim her part, because "[t]he recording may be made at any time ..." At the time the Barbers acquired Unit # 1, the Camel divorce was recorded. Unlike Squyres, the Barbers were not entitled to ignore it. R.S. 9:2756 gave the Camels the right to record the judgment "at any time, after which it shall ... affect third persons from the time of recording."
By such an interpretation we would give full effect to R.S. 9:2756.
NOTES
[1] Article 1839 was enacted by 1984 La.Acts, No. 331, § 5, effective Jan. 1, 1985, in the 1984 revision of Book III, Title III of the Civil Code, Obligations in General. It does not change the law but restates the principles of former articles 2275, 2264, 2265, and 2266. La.Civ.Code.Ann. art. 1839 comment (a). Further, it embodies the scheme contained in the Civil Code Ancillaries on recordationLa.Rev.Stat.Ann. §§ 9:2721-2724 (West 1965). La.Civ.Code Ann. art. 1839 comment (b).
[2] Former La.Civil Code article 2266 was redesignated as La.R.S. 9:2756 by 1984 La.Acts, No. 331, § 5, effective Jan. 1, 1985 in the 1984 revision of Book III, Title III of the Civil Code, Obligations in General.
[3] The double declaration rule was statutorily overruled in the 1979 revision of the Civil Code articles on matrimonial regimes. La.Civ.Code Ann. art 2340 (West 1985). This court in Tullier has ruled that "Article 2340 should be applied retroactively." Tullier v. Tullier, 464 So.2d 278 (La.1985). See also, Wood v. Wood, 424 So.2d 1143 (La.App. 1st Cir.1982).
[4] La.R.S.Ann. § 35:11 (B), (C) and (D) (West Supp.1988) (added by 1987 La.Acts, No. 467, § 1, effective Sept. 1, 1987) creates a presumption that the declaration of marital status required in an act of acquisition of immovable property by La.R.S. 35:11 A is correct. Those provisions, added to that statute in 1987 are as follows:

A. ...
B. A declaration as to one's marital status in an acquisition of immovable property by the person acquiring the property creates a presumption that the marital status as declared in the act of acquisition is correct and, except as provided in Subsection C of this Section, any subsequent alienation, encumbrance, or lease of the immovable by onerous title shall not be attacked on the ground that the marital status was not as stated in the declaration.
C. Any person may file an action to attack the subsequent alienation, encumbrance, or lease on the ground that the marital status of the party as stated in the initial act of acquisition is false and incorrect; however, such action to attack the alienation, encumbrance, or lease shall not affect any right or rights acquired by a third person acting in good faith.
D. The presumption provided in Subsection B of this Section is hereby declared to be remedial and made retroactive to any alienation, encumbrance, or lease made prior to September 1, 1987. Any person who has a right as provided in Subsection C of this Section, which right has not prescribed or otherwise been extinguished or barred upon September 1, 1987 and who is adversely affected by the provisions of Subsection C of this Section shall have six months from September 1, 1987 to initiate an action to attack the transaction or otherwise be forever barred from exercising his right or cause of action.
Compare the action taken by the Legislature here with the proposed resolution in § 9 of the Uniform Marital Property Act. Unif. Marital Property Act, 9A U.L.A. 120 (1987). See also, Wellman, Third Party Interests Under the Uniform Marital Property Act, 21 Houston L.Rev. 717 (1984).